# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Edward Nunn on his own behalf
and on behalf of his minor son,
Zachary Nunn,

          Plaintiffs,

      v.

City of Woodbury, Officer V. Braman
(in her individual and official capacity),
Officer Alanna Beane (in her individual
and official capacity), Officer J. Altman
(in his individual and official capacity),
Officer J. Gort (in his individual and official
capacity), Officer Jeff Benysek (in his
individual and official capacity),

          Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 05-632 ADM/JSM

_____

Stephen L. Smith, Esq., The Law Firm of Stephen L. Smith, PLLC, Minneapolis, MN, on behalf
of Plaintiffs.

Joseph E. Flynn, Esq., Jardine, Logan & O'Brien, P.L.L.P., Lake Elmo, MN, on behalf of
Defendants.

_____

## I. INTRODUCTION

On September 21, 2006, oral argument before the undersigned United States District

Judge was heard on Defendants City of Woodbury, Officer Vickie Braman ("Braman"), Officer

Alanna Beane ("Beane"), Officer John Altman ("Altman"), Officer Jeffrey Gort ("Gort"), and

Officer Jeff Benysek's ("Benysek") (collectively "Defendants") Motion for Summary Judgment

[Docket No. 12] and Motion for Default Judgment [Docket No. 18], and Plaintiffs Edward Nunn

("Nunn") and Zachary Nunn's ("Zachary") (collectively "Plaintiffs") Motion to Set Aside

Default and Leave to Answer Counterclaim [Docket No. 30].  In their Complaint [Docket No. 1],

Plaintiffs allege that Defendants used excessive force in violation of 42 U.S.C. § 1983 and the Fourth Amendment.  Plaintiffs also allege negligence and vicarious liability.  For the reasons set forth below, Defendants' Motion for Summary Judgment is granted, Defendants' Motion for Default Judgment is denied, and Plaintiffs' Motion to Set Aside Default and Leave to Answer Counterclaim is denied as moot.

## II. BACKGROUND

### A.   Gas Station Incident

On February 8, 2004, after picking up his fourteen-year-old son Zachary and two of Zachary's friends from a movie theater, Nunn drove to the BP gas station in Woodbury, Minnesota, to wash his car.  E. Nunn Dep. (Flynn Aff. [Docket No. 15] Ex. A) at 41, 43; Z. Nunn Dep. (Flynn Aff. Ex. C) at 11-12, 21, 23.  While Nunn was inside the gas station, a large sport utility vehicle ("SUV") parked in front of Nunn's car, blocking his path to the car wash.  E. Nunn Dep. at 44; Z. Nunn Dep. at 23.  After exiting the gas station, Nunn tapped on the back window of the SUV and asked the occupants to move, but they refused.  E. Nunn Dep. at 44. Nunn then asked the occupants of the SUV to move a second time.  Id. at 45.  Again, they refused, and according to Nunn, the male, teen-aged driver said, "Go around homeboy."  Id. at 45-46.  Nunn then got out of his car, approached the driver of the SUV, and asked him to move again.  Id. at 46.  The driver did not move the car, and according to Nunn the SUV's four occupants were "lipping off," making derogatory racial remarks, and swearing.  Id. at 47.

Nunn felt threatened and grabbed a snow shovel that was leaning against the gas station. Id. at 48-49; Z. Nunn Dep. at 36.  At some point, all the occupants of the SUV left the vehicle and yelled at Nunn.  One of the females jumped at Nunn and he "raised the shovel to keep her

off of me." E. Nunn Dep. at 51. Nunn asked Zachary and his friends to get out of Nunn's vehicle to join him "so they'd realize I was not alone," but only Zachary did so. Id. at 50; Z. Nunn Dep. at 34. The gas station attendant came out of the store, told everyone to leave, and stated that he was calling the police. E. Nunn Dep. at 52; Z. Nunn Dep. at 35-36. Nunn told the clerk to "get the fuck back in the store." E. Nunn Dep. at 53-54; Z. Nunn Dep. at 36. The SUV left the gas station, and Nunn began to wash his car. E. Nunn Dep. at 52, 54; Z. Nunn Dep. at 38.

Officers Beane, Braman, and Altman responded to the call from the gas station attendant. Beane Dep. (Flynn Aff. Ex. F) at 6; Braman Dep. (Flynn Aff. Ex. E) at 14; Altman Dep. (Flynn Aff. Ex. D) at 8. Beane arrived first and waited for Nunn to exit the car wash. Beane Dep. at 7; E. Nunn Dep. at 55. Nunn avers that after leaving the car wash, he stopped his car and waited for the officers to approach him. E. Nunn Dep. at 56-57. Officer Beane states that Nunn got out of his car, and Officer Braman, who had just arrived, had to tell Nunn twice to return to his car before Nunn complied. Beane Dep. at 10; Braman Dep. at 20-21. According to Nunn, he said, "Hello" and "Can I help you?" to Officer Braman, to which she replied, "Shut up," and "I'll ask the questions here." E. Nunn Dep. at 60-61. According to Braman, she asked Nunn for identification and got a brief statement from him about what had occurred. Braman Dep. at 23. Braman has testified Nunn appeared agitated. Id. at 45.

After speaking with Nunn, Braman went inside the gas station to assist Officer Altman and watch the surveillance video of the incident. Id. at 24-25. While Braman and Altman were inside, Nunn exited his car. Beane Dep. at 12-13. Beane exited her squad car and asked Nunn three times to return to his car before he complied. Id. at 13. According to Nunn, when

3

instructed to get back inside his car, he immediately did so and at no point was he told repeatedly to get back in his car.  E. Nunn Dep. at 58-59.  Beane avers that when Nunn got out of his car, he repeatedly yelled, "Am I under arrest?"  Beane Dep. at 13; E. Nunn Dep. at 62-63.  Beane told Nunn that he was being detained for investigative purposes.  Beane Dep. at 13; E. Nunn Dep. at 63.  Beane testified that Nunn was "angry, yelling, shouting with arm gestures."  Beane Dep. at 28.

After watching the surveillance video, Altman spoke with Nunn, and Nunn explained his version of events.  Altman Dep. at 9-10.  During their conversation, Altman took Nunn's elbow and led Nunn to his squad car.  E. Nunn Dep. at 64.  Altman told Nunn that Nunn was raising his voice and acting aggressive.  Id.  Altman avers that Nunn's behavior of being argumentative and talking in an angry fashion was alarming.  Altman Dep. at 31.  Nunn asked Altman "how many times he actually stopped and talked to African-American people."  E. Nunn Dep. at 64.  Altman responded that it was not about race.  Id. at 64-65.  While Nunn was in the squad car, Zachary's friend's father picked up Zachary's two friends.  Id. at 73; Z. Nunn Dep. at 56.  After considerable time in the squad car, Nunn was told that the incident was his fault and was issued a disorderly conduct citation.  E. Nunn Dep. at 65; Braman Dep. at 35.  Nunn threw the citation in the trash and said, "This is bullshit."  E. Nunn Dep. at 66.

Upon returning to his car, Nunn thought one of his car doors was ajar, so he got out and checked the doors.  Id. at 66-67; Braman Dep. at 32.  Officer Braman shined a light at Nunn and yelled at him to get back in his car and go home.  E. Nunn Dep. at 67; Z. Nunn Dep. at 54; Braman Dep. at 32.  Nunn said that he did not have to go anywhere because it was a free country, and told the officer to "quit fucking with me."  E. Nunn Dep. at 67-68.  Nunn got in his

4

car, and admits he was angry.  Id. at 67, 70.

**B.     Following Police Officers**

Officer Braman left the gas station and pulled up to a red stoplight.  Braman Dep. at 40.

As she waited for the light to change, Nunn pulled up alongside Braman.  Id. at 40; E. Nunn

Dep. at 69; Z. Nunn Dep. at 57.  Braman became concerned for her safety because she believed

Nunn had pulled up very close to her squad car, so she backed up and pulled behind Nunn's car.

Braman Dep. at 40-41; E. Nunn Dep. at 69-70.  Officer Beane left the gas station and pulled up

behind Braman's squad car.  Beane Dep. at 35-36.  The light changed and Nunn proceeded

straight through the intersection with Braman and Beane following behind him.  E. Nunn Dep. at

74.  Nunn quickly made a right-hand turn to see if the officers would continue to follow him, but

they did not.  Id. at 74-75.

Nunn began driving toward his home, and as he approached his residence, he saw two

squad cars driving in front of his house.  Id. at 75-79.  Nunn was "baffled" and "angry" that there

were squad cars in front of his home, and he felt the officers were harassing him.  Id. at 76, 79,

88.  Nunn reversed his car and turned onto a nearby street to follow one of the squad cars.  Id. at

80-81.  Braman observed Nunn reversing his car and positioning himself directly behind her

squad car at a close distance.  Braman Dep. at 75-76.  Nunn avers that he flashed his headlights

so he could find out who was driving the squad car.  E. Nunn Dep. at 81-83.  Braman testified

that Nunn drove very closely behind her, flashed his high beams on and off, and honked his

horn.  Braman Dep. at 76.  Braman became very concerned for her safety and radioed to other

officers to report Nunn's actions and her location.  Id. at 76, 81.  Nunn continued to follow

Officer Braman for several blocks.  E. Nunn Dep. at 84-87.

As the cars approached a red stop light, Nunn pulled into the left-hand turn lane, alongside Officer Braman. E. Nunn Dep. at 88-90; Braman Dep. at 81-82. Nunn was able to observe that the driver of the squad car was one of the female officers from the gas station. E. Nunn Dep. at 91. Braman wanted to get away from Nunn, so she activated her emergency lights and made a right-hand turn. Id. at 92; Braman Dep. at 83. Upon seeing the flashing lights, Nunn believed Braman was trying to pull him over, so he turned around in the intersection to pull over behind Officer Braman. E. Nunn Dep. at 92. Nunn then saw Officer Braman speed away. Id. at 93. Braman testified that she was very concerned for her safety, and that "in the ten years that I've been a . . . cop, this is one of the top two most afraid that I have been." Braman Dep. at 84. At that point, Nunn believed the officers were harassing him and were not going to allow him to go home, so he pulled into a nearby Target parking lot to contemplate "whether or not I was going to get home alive that night." E. Nunn Dep. at 97, 101.

Officer Beane heard and responded to Officer Braman's call for assistance. Beane Dep. at 41. Soon after arriving in the area, Officer Beane, while waiting in a left-hand turn lane at a red light, spotted Nunn's car directly across from her. Id. at 49; E. Nunn Dep. at 105-06. Nunn avers that he was on his way home. E. Nunn Dep. at 106. Although Nunn had a green light, he waited at the intersection and flashed his bright headlights at Beane. Id. at 107-10; Beane Dep. at 49-50. Nunn recognized Beane as the other female officer from the gas station. E. Nunn Dep. at 107. Nunn waited until Beane made a left-hand turn in front of him, and then pulled directly behind her. Beane Dep. at 49-50. Beane radioed to other officers to report Nunn's actions and advised that Nunn was following so closely behind her, she could barely see his headlights. Id. at 51.

6

**C.      Pursuit and Collision**

Officer Benysek, responding to Braman and Beane's radio calls, observed Nunn traveling

at an extremely close distance behind Beane, "inappropriate for the road conditions."  Benysek

Dep. (Flynn Aff. Ex. H) at 27, 29.  Benysek believed "[i]t reflected the harrassive nature of what

Officers Beane and Braman had previously reported."  Id. at 30.  Benysek decided to stop Nunn,

and activated his emergency lights.  Id. at 31-32; E. Nunn Dep. at 112.  Officer Gort had also

arrived in the area and was behind Officer Benysek's vehicle.  Gort Dep. (Flynn Aff. Ex. G) at

24.  Nunn pulled to a stop on the right-hand side of the road, and Benysek came to a stop behind

him.  Benysek Dep. at 32; E. Nunn Dep. at 113.  At that point, it occurred to Nunn that "it was

dark, that they had been jacking with me, harassing me the whole time" and "[i]f they're going to

continue to harass me, it's going to be at home."  E. Nunn Dep. at 113.  Nunn pulled back onto

the road and began driving toward his home.  Id.; Z. Nunn Dep. at 72.  Benysek and Gort had

begun exiting their cars when they observed Nunn resume driving.  Benysek Dep. at 33; Gort

Dep. at 27.  Benysek got back in his car, drove after Nunn, turned on his siren, and advised

dispatch of the pursuit.  Benysek Dep. at 34.[1]

Benysek pursued Nunn because he was concerned about Nunn's behavior and "the safety

risk he would impose on the public should we not end the situation."  Id. at 11-12.  Gort also

pursued Nunn because he believed that Nunn's "behavior was different from anything I've ever

dealt with on the job" and that Nunn "was dangerous."  Gort Dep. at 59.  The pursuit began just

before 11:00 pm on a Sunday night.  Id. at 69.  There was fresh snow on the ground and the

---

[1] The stop, pursuit, and collision were captured on tape by video recorders in both
Benysek and Gort's squad cars.  Flynn Aff. Exs. S, T.  The Court has reviewed the video tapes.

7

roads were slippery.  Id. at 28-29.  Due to the snowstorm, people had "pretty much holed up for the night."  Id. at 69.  Gort was driving approximately forty miles per hour, and claims Nunn was driving faster, approximately fifty to sixty miles per hour.  Id. at 29.  Approximately thirty seconds into the pursuit, Nunn lost control of his car and slid into a snow bank.  Flynn Aff. Exs. S, T; Benysek Dep. at 34.  Nunn described his actions as the car not "mak[ing] the turn as nice as I wanted it to."  E. Nunn Dep. at 117.  Benysek pulled up close to Nunn to ensure Nunn could see him, and attempted to block Nunn in.  Benysek Dep. at 34-35.  Nunn reversed out of the snow bank and continued driving forward, away from the officers.  Id. at 35; E. Nunn Dep. at 118.  Nunn avers he could have driven through the snow bank rather than reversing, but was concerned about driving forward since he had just washed the car.  E. Nunn Dep. at 118. Benysek advised Gort to take the lead position because unlike Benysek, Gort had momentum, a fully marked squad car, properly functioning sirens, and push bumpers.  Benysek Dep. at 9-10, 35-36; Gort Dep. at 31-32.  Gort drove around Officer Benysek's car and took the lead following Nunn.  Gort Dep. at 33-34.

After approximately one quarter of a mile, Gort observed Nunn's brake lights illuminate, and Gort started to catch up with Nunn.  Id. at 34-35.  Nunn put on his turn signal and turned left into the driveway of his home, coming to almost a complete stop.  Id. at 35; E. Nunn Dep. at 120.  Gort avers he did not know if Nunn was turning left onto a driveway or another road because he was focusing on Nunn's car and not looking to his left.  Gort Dep. at 35-37.  As Nunn was turning into his driveway, Gort hit the driver's door and front quarter panel of Nunn's car in

an attempt to push Nunn into a snow bank and end the pursuit.[2]  Id. at 35, 39; Benysek Dep. at

37; E. Nunn Dep. at 120, 124.  Gort avers he was driving approximately twenty miles per hour at

the time of the impact.  Gort Dep. at 39, 84.  The pursuit lasted less than ninety seconds.  Flynn

Aff. Exs. S, T.  Soon after the incident, both Nunn and Zachary complained of neck and back

pain.  E. Nunn Dep. at 138-56; Z. Nunn Dep. at 79-81, 85-94.

**D.     Woodbury Pursuit Policy**

The Woodbury pursuit policy, in effect at the time of this incident, specifically states that

"Officers must carefully exercise their discretion to participate, continue, or terminate a pursuit.

This discretion necessarily involves the consideration of complex and unpredictable factors."

Gort Dep. Ex. 4 at 2-3.  The policy contains a non-exhaustive list of factors for officers to

consider when determining whether to begin or continue a pursuit, including (1) seriousness of

the known offenses and their relationship to community safety, (2) time of day, (3) location, e.g.,

schools, residential areas, etc., (4) weather/visibility, (5) road conditions, (6) presence of

pedestrians and other vehicles, (7) familiarity with location and roadway design, (8) capability

and quality of police equipment and communications, and (9) speeds and evasive tactics.  Id. Ex.

4 at 4.

---

[2] In his report, Gort described his contact with Nunn's vehicle as a "PIT" maneuver.
Gort Dep. at 19.  Specifically, a Pursuit Intervention Technique ("PIT") maneuver is a procedure
in which an officer, traveling at high speeds, uses the front end of his squad car to make contact
with the right rear or right left quarter panel of the suspect car to cause the suspect car to spin
out, thus ending the pursuit.  Benysek Dep. at 17-18; Mihelick Dep. (Flynn Aff. Ex. I) at 15.
Several of the officers testified that the term "PIT"is often used in a generic sense to mean
contact with a vehicle.  Gort Dep. at 19; Benysek Dep. at 16-17; Mihelick Dep. at 27-29;
Braman Dep. at 11; Altman Dep. at 25.  Gort avers that while he used the term "PIT" in his
report, what he actually executed was a low speed contact, which is described in the Woodbury
pursuit policy.  Gort Dep. at 17-19.  Gort has not had training on execution of a PIT maneuver.
Id. at 16-17.

The policy contains exceptions to the rule that there "shall" be no contact with the subject vehicle unless deadly force is warranted, including an exception for subject vehicles that have reduced their speed or come to a stop.  Specifically, the relevant exception states:

> During the course of vehicular pursuits, fleeing vehicles often reduce speeds to low levels or come to a stop due to turns, loss of control, contact with other vehicles or objects, etc. During these situations, an officer may block or have intentional controlled, low speed contact with the suspect to prevent the continuation of the pursuit which would result in further endangerment to life and property if all the following apply:
>
> (1) The officer reasonably believes that contact, if made, will not result in death or great bodily harm to the occupants of the fleeing vehicle, the officer, or other people in the immediate area.
>
> (2) The continued pursuit or escape of the suspect would result in greater danger to the public safety than the striking of the fleeing vehicle.

Id. Ex. 4 at 7-8.  The policy also lists several circumstances and examples in which a pursuit "shall" be terminated, including (1) situations in which the officer knows or reasonably should know that the probability of harm to persons arising from the pursuit outweighs the need for immediate apprehension or the potential harm threatened by the escaping offender, (2) the driver or passenger is not suspected of a violent felony and attempts to evade in a reckless manner, and (3) the suspect's identity has been established to the point that later apprehension can be accomplished and there is no longer a need for immediate apprehension.  Id. Ex. 4 at 9-12. Officers, including Gort, have classroom training on the pursuit policy and how to execute low speed contacts, but do not actually physically practice the maneuver.  Id. at 55; Braman Dep. at 7, 13-14.

### III. DISCUSSION

10

## A.   Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## B.   Default Judgment

In response to Plaintiffs' Complaint, Defendants filed an Answer and Counterclaim [Docket No. 2].  Plaintiffs failed to respond to Defendants' Counterclaim, and Defendants now ask for a default judgment.  Plaintiffs aver that they failed to answer the Counterclaim because they mistakenly believed that the Counterclaim, although labeled as such, was intended as an affirmative defense that did not require a response.  Plaintiffs ask the Court to set aside their default and grant leave to answer the Counterclaim.

"Default judgment for failure to defend is appropriate when the party's conduct includes 'willful violations of court rules, contumacious conduct, or intentional delays.'" Ackra Direct Mktg. Corp. v. Fingerhut Corp., 86 F.3d 852, 856 (8th Cir. 1996) (citing United States v. Harre,

11

983 F.2d 128, 130 (8th Cir. 1993)).  "The Federal Rules of Civil Procedure commit the entry of a default judgment against a party to the sound discretion of the trial court."  <u>FTC v. Packers Brand Meats, Inc.</u>, 562 F.2d 9, 10 (8th Cir. 1977).  There is a "strong judicial policy against default judgments" and a "judicial preference for adjudication on the merits."  <u>Oberstar v. FDIC</u>, 987 F.2d 494, 504 (8th Cir. 1993).

In this case, Defendants' response to Plaintiffs' Complaint was clearly labeled as a "**<u>COUNTERCLAIM</u>**."  The Counterclaim asserts a claim for contribution and/or indemnity from Edward Nunn for any damages awarded to Zachary Nunn arising from this action. Plaintiffs' averment that they believed the Counterclaim was actually an affirmative defense that required no response is unconvincing.  Nonetheless, there is a preference for adjudication on the merits and Plaintiffs' conduct is not so egregious as to warrant the entry of a default judgment. In the future, Plaintiffs should respond to counterclaims to avoid the risk of default judgment. Defendants' Motion for Default Judgment is denied.  Because of the grant of Summary Judgment to Defendants, any indemnification or contribution is moot.  Consequently, Plaintiffs' Motion to Set Aside Default and Leave to Answer Counterclaim is denied as moot.

**C.    42 U.S.C. § 1983**

**1.    Constitutional Violation**

"In order to survive a motion for summary judgment under § 1983, the plaintiff must raise a genuine issue of material fact as to whether (1) the defendants acted under color of state law, and (2) the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right."  <u>Cooksey v. Boyer</u>, 289 F.3d 513, 515 (8th Cir. 2002).  In this case, Plaintiffs allege that the Officer Defendants violated 42 U.S.C. § 1983 and the Fourth Amendment by

using excessive force to detain Plaintiffs.  Excessive force claims are "analyzed under the Fourth Amendment and its 'reasonableness' standard."  Graham v. Connor, 490 U.S. 386, 395 (1989). The relevant inquiry, then, is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  Id. at 397 (citations omitted).  Factors to consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Id. at 396.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Hernandez v. Jarman, 340 F.3d 617, 622 (8th Cir. 2003) (citing Graham, 490 U.S. at 396).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  Graham, 490 U.S. at 396-97.

Plaintiffs' section 1983 claim fails because the officers did not violate Plaintiffs' constitutional rights.  Plaintiffs have established no genuine issue of material fact for trial, and viewing the facts in the light most favorable to Plaintiffs, the amount of force used was objectively reasonable under the circumstances.  Nunn was fleeing from police officers at a high rate of speed on residential streets covered with freshly fallen snow.  Nunn had just received a citation for disorderly conduct in a situation in which the officers perceived Nunn's behavior as highly unusual and alarming, and during which Nunn admitted he was angry.  Immediately following the incident at the gas station, Nunn followed officers in their marked squad cars and behaved aggressively toward the officers—flashing his headlights, honking his horn, and coming

very close to the officers' squad cars.  One of the officers testified that it was "one of the top two most afraid that I have been" in her ten-year law enforcement career.  Although Nunn felt that the police were harassing him, and avers that he only followed them in an attempt to discover their identities so that he could report them, Nunn's subjective intentions and beliefs are largely irrelevant.

Nunn argues that the officers knew where he lived, and could have confronted him later at his home about his behavior rather than pursuing him.  However, it was reasonable for the officers to believe that going to Nunn's home at a later time was not an acceptable option: Nunn had rejected several opportunities to drive home during the course of the night's events, and was instead following squad cars in a dangerous manner.  Nunn also argues that Officer Gort should have known that Nunn was turning into a driveway and coming to a stop.  However, Officer Gort was primarily focused on the car in front of him rather than looking to his left, and Nunn's previous actions had given Gort no reason to believe that Nunn was actually coming to a stop.  During the pursuit, Nunn slid into a snow bank, and then rather than remaining stopped, reversed his car and resumed driving forward, away from the police that were pursuing him.  Nunn further argues that it was unreasonable for Officer Gort to do a "PIT" move when he has no training in how to do a "PIT" maneuver.  As an initial matter, the officers testified that the term "PIT" is used in a generic sense to indicate some type of vehicle-to-vehicle contact to terminate a pursuit, and Gort has had some classroom training in how to execute low speed contacts.  Even if Gort was specifically attempting a "PIT" maneuver, his actions were not unreasonable given the circumstances.  In the totality of the circumstances, Officer Gort's actions of ending the pursuit by pushing Nunn's car into a snow bank after hitting Nunn's almost-stopped car with his squad

14

car traveling approximately twenty miles per hour was objectively reasonable.[3]

## 2.    Qualified Immunity

In the alternative, the Officer Defendants argue that they are entitled to qualified immunity. The standard for assessing qualified immunity is one of "objective legal reasonableness." Winters v. Adams, 254 F.3d 758, 766 (8th Cir. 2001) (citing Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982). The first question is whether, viewing the facts in the light most favorable to the party asserting the injury, the officer's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001). If the first question is answered in the affirmative, the second question is whether the right violated was clearly established. Id. To determine whether a particular right was clearly established, it must be viewed in a particularized, relevant sense: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 639-40 (1987). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. "Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law." Greiner v. City of Champlin, 27 F.3d 1346, 1352 (8th Cir. 1994). "Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that the defendant should have taken the disputed action." Winters, 254 F.3d at 766.

---

[3] In reaching its decisions, the Court did not rely upon the Expert Report of Scott Bechthold (Flynn Aff. Ex. Z).

As is discussed above, Officer Gort's conduct did not violate Plaintiffs' constitutional rights. Even if it did, the right at issue is not clearly established. It is true that from a generalized perspective, the right to be free from unreasonable seizures under the Fourth Amendment is clearly established. However, when viewed in a more particularized sense, it would not be clear to a reasonable officer that Gort's actions were unlawful in the situation he confronted. From Officer Gort's objective perspective, Nunn was fleeing from police after receiving a disorderly conduct citation and engaging in a course of conduct in which he followed police squad cars at a very close distance, flashed his bright lights, and honked his horn. Nunn appeared aggressive, angry, and uncontrollable. Nunn had already stopped his vehicle once after sliding into a snow bank, only to reverse out of it and continue driving away from the police. Gort ended the pursuit by ramming his squad car into Nunn's car at a speed of approximately twenty miles per hour. It cannot be said that no reasonably competent officer, making a split-second judgment in this tense, uncertain, and rapidly evolving situation, would have taken the same action that Officer Gort did. Accordingly, the Officer Defendants are entitled to qualified immunity.[4]

**D.    Negligence and Official Immunity**

Plaintiffs have also asserted a state law claim of negligence against Defendants. Specifically, Plaintiffs allege that (1) the officers recklessly engaged in a vehicle pursuit of [P]laintiffs in violation of City policy, and (2) during the pursuit, Officer Gort operated his squad car in a negligent, careless, reckless, and illegal manner causing his vehicle to collide with

---

[4] Because the officers are entitled to qualified immunity, there is no need to analyze Plaintiffs' punitive damages claim.

16

Nunn's vehicle.  Plaintiffs further allege that the City of Woodbury is vicariously liable for its officers' negligent conduct.  The Officer Defendants argue that they are entitled to official immunity.

"Official immunity is an immunity from suit and the question may be appropriately resolved on summary judgment."  <u>Reuter v. City of New Hope</u>, 449 N.W.2d 745, 751 (Minn. Ct. App. 1990).  "Official immunity 'prevents a public official charged by law with duties which call for the exercise of his judgment or discretion' from being held personally liable for damages, unless the official has committed a willful or malicious act."  <u>Mumm v. Mornson</u>, 708 N.W.2d 475, 490 (Minn. 2006) (citing <u>Elwood v. County of Rice</u>, 423 N.W.2d 671, 677 (Minn. 1988) (quoting <u>Sulsa v. State</u>, 247 N.W.2d 907, 912 (Minn. 1976))).  "Official immunity enables public employees to perform their duties effectively, without fear of personal liability that might inhibit the exercise of their independent judgment."  <u>Mumm</u>, 708 N.W.2d at 490.  An official immunity analysis requires courts to determine (1) whether the conduct at issue involves ministerial or discretionary duties, and (2) if the duties are discretionary, whether the officials acted willfully or maliciously.  <u>Id.</u> at 490.

A ministerial duty is "one that is 'absolute, certain, and imperative, involving merely the execution of a specific duty arising from fixed and designated facts.'"  <u>Anderson v. Anoka Hennepin Indep. Sch. Dist. 11</u>, 678 N.W.2d 651, 656 (Minn. 2004) (citations omitted).  "In contrast, a duty is discretionary if it involves 'more individual professional judgment that necessarily reflects the professional goal and factors of a situation.'"  <u>Mumm</u>, 708 N.W.2d at 490-91 (citation omitted).  The Minnesota Supreme Court "has suggested, as a general matter, that police charged with the duty to prevent crime and enforce the laws are not purely

17

'ministerial officers' in that many of their duties are of an 'executive character involving the exercise of discretion.'" Elwood, 423 N.W.2d at 678 (citations omitted).  Nonetheless, "[w]hether an officer's conduct merits immunity . . . turns on the facts of each case."  Id. Malice, in the immunity context, "means 'the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right.'" Kari v. City of Maplewood, 582 N.W.2d 921, 924 (Minn. 1998) (citations omitted).  In other words, the relevant question is "whether in doing the wrongful act while responding to an emergency, the public employee so unreasonably put at risk the safety and welfare of others that as a matter of law it could not be excused or justified."  Id.

The conduct at issue involves the officers' decision to begin and continue a pursuit of Nunn, and Officer Gort's decision to terminate the pursuit by ramming Nunn's car into a snow bank.  The officers' decisions were guided by the Woodbury pursuit policy.  The policy specifically states that officers must exercise discretion to participate, continue, or terminate a pursuit, and that their discretion necessarily involves the consideration of complex and unpredictable factors.  Gort Dep. Ex. 4 at 2-3.  The policy also gives officers guidelines to follow regarding when they may have intentional controlled, low speed contact with a slowed or stopped suspect vehicle, including requiring the officers to reasonably believe that the contact will not result in death or great bodily harm, and that the pursuit or escape of the suspect would result in greater danger than the collision with the vehicle.  Id. Ex. 4 at 7-8.  Also, the policy lists several circumstances and examples in which a pursuit "shall" be terminated, including (1) situations in which the officer knows or reasonably should know that the probability of harm to persons arising from the pursuit outweighs the need for immediate apprehension or the potential

18

harm threatened by the escaping offender, (2) the driver or passenger is not suspected of a violent felony and attempts to evade in a reckless manner, and (3) the suspect's identity has been established to the point that later apprehension can be accomplished and there is no longer a need for immediate apprehension. Id. Ex. 4 at 9-12.

All of the identified, applicable portions of the pursuit policy require officers to balance competing factors based on the circumstances confronting them and to exercise discretion in making a decision. The officers' duties under the pursuit policy are not ministerial by their very nature because the officers will always be confronted with a different set of facts when determining whether to begin, continue, or end a pursuit. The officers are required to exercise their discretion based on the guidelines of the pursuit policy. In this case, the conduct at issue involves discretionary duties, and there is no evidence that the officers acted willfully or maliciously. Instead, the evidence shows that the officers weighed the factors at hand and exercised discretion in determining whether to begin and end a pursuit of Nunn.

Although Nunn had not committed a violent felony, he had received a disorderly conduct citation in unusual circumstances and behaved in an alarming, aggressive, and angry manner. After receiving the citation, Nunn followed marked squad cars at a very close distance, honking his horn and flashing his headlights. When Officer Benysek tried to pull Nunn's car over, Nunn initially stopped, but then immediately took off. The officers pursued Nunn through snow-covered streets around 11 pm on a Sunday night. At one point, Nunn slid to a stop in a snow bank, put his car in reverse, and then continued driving forward away from the officers. Nunn's behavior, whatever his subjective intentions and beliefs were, led the officers to reasonably believe that Nunn was dangerous and unpredictable. Officer Gort, driving at a speed of twenty

19

miles per hour, hit Nunn's almost stopped car with his squad car and pushed Nunn's car into a snow bank, ending the pursuit.  At the time, Officer Gort did not realize that Nunn was turning into his own driveway, but even if Officer Gort had been aware of this fact, Nunn's behavior gave the officers no indication that he actually intended to stop his car.  A review of the circumstances reveals that the officers exercised reasonable discretion, not malice, based on the pursuit policy factors and the facts before them.  Accordingly, the officers are entitled to official immunity.  In addition, because the officers are entitled to official immunity, the City of Woodbury is vicariously immune from suit.  See Pletan v. Gaines, 494 N.W.2d 38, 43 (Minn. 1992).

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Defendants' Motion for Summary Judgment [Docket No. 12] is **GRANTED**;

2.    Defendants' Motion for Default Judgment [Docket No. 18] is **DENIED**; and

3.    Plaintiffs' Motion to Set Aside Default and Leave to Answer Counterclaim [Docket No. 30] is **DENIED AS MOOT**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

s/Ann D. Montgomery
_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:   December 21, 2006

20